SOUDAN PLANTING COMPANY *v.* STEVENSON.

Opinion delivered May 6, 1907.

1. CONTRACT—CONSIDERATION—EXPECTATION OF PARTY.—Where lands were sold under an agreement that the vendees should .pay therefor 350 bales of cotton, averaging weight 500 pounds, annually for ten years, without any stipulation as to where the cotton should be raised, the expectation of the vendor that he would receive whatever cotton was raised on the land, not exceeding in any way the number of bales stipulated, not carried into the contract, did not constitute the consideration of the contract.    (Page 169.)

2. EVIDENCE—VARYING WRITING—SECRET INTENTIONS.—While ambiguous terms in a written contract may be interpreted to carry out the intention of the parties, their secret intention can not be imported into contracts whose terms and meanings are unambiguous, and which do not express it.    (Page 170.)

3. CONTRACT—CONSTRUCTION.—A contract to deliver a specified number of bales of cotton, without indicating grade or quality, is held to mean cotton of the average grade and quality at the time and place of delivery.    (Page 171.)

4. EVIDENCE—CONCLUSIVENESS OF WRITING.—All antecedent negotiations, whether oral or written, are deemed to be merged into a written contract which covers the subject-matter of the antecedent negotiations, when such contract itself is free from ambiguity.    (Page 171.)

5. SAME—PAROL PROOF THAT WRITING WAS INCOMPLETE.—In order to render parol evidence admissible for the purpose of making complete an incomplete contract, the incompleteness of the contract must appear either on its face, or from circumstances surrounding the parties at the time the contract was executed.    (Page 172.)

6. SAME—VARYING WRITTEN CONTRACT.—Where an unambiguous contract stipulated for the future delivery of a designated number of bales of cotton, it is not admissible to show by parol evidence that the parties intended that the delivery should be from the crop grown on certain lands.    (Page 173.)

Appeal from Lee Chancery Court; *Edward D. Robertson,* Chancellor; reversed.

STATEMENT BY THE COURT.

H. P. Rodgers was the owner of two plantations situated on the St. Francis River, in Lee County, known as the "Soudan" and "Westwood" places.   He sold the same to Henry Banks and Lem Banks.   The Soudan Planting Company was a corporation formed by the Messrs. Banks for the purpose of receiving title

to said lands and operating the plantations thereon. The consideration for the sale of the property was $100,000, divided into ten equal payments, bearing six per cent. interest. "But, instead of being paid in cash, it is agreed that the parties of the second part shall pay same in cotton as follows: They shall deliver each year, beginning with 1903, 350 bales of cotton to the warehouse at Marianna for the party of the first part; said bales shall average in weight five hundred pounds, and shall be delivered as follows: One hundred and sixteen bales on or before October 15th, 118 bales on or before November 15th, and 116 bales more on or before December 15th (making a total of 350 bales), each year for ten years, beginning with 1903; and, in the case delivery is hindered by bad weather, scarcity of pickers or other circumstances beyond the control of purchasers, then delivery of cotton shall be made as soon after dates named as possible. The first payment shall be guarantied individually by the parties of the second part [who were Henry Banks and Lem Banks]." Pending negotiations, Mr. Lem Banks wrote Mr. Rodgers the following letter:

"MEMPHIS, TENN., Nov. 10, 1902.
"MR. H. P. RODGERS, Marianna, Arkansas.

"DEAR SIR: I did not write you at once, as Mr. Henry Banks was out of town. Mr. Henry Banks says that cotton is to be delivered on or before dates named. Also that, in case of bad weather, scarcity of pickers, or circumstances hindering beyond our control, then as soon after those dates as possible. He says that you will recall this by the fact that you and he discussed the cotton and agreed that he could probably deliver our part of the crop on those dates, but that the part belonging to tenants would have to go to pay for supplies. As contract is now changed, it would take all cotton on the place, both ours and tenants as fast as picked. It is our intention to deliver cotton as rapidly as we can conveniently, and so I think above will cover it. I have re-drawn contract and inclose it. I suppose the shortage is in woodland.

"Yours truly,

"LEM BANKS."

Pursuant to the request of Mr. Banks in said letter, the clause inserting into the contract the provision that, "in case de-

livery is hindered by bad weather, scarcity of pickers or other circumstances beyond the control of purchasers, then [delivery of cotton shall be made] as soon after those dates as possible" was agreed to by Mr. Rodgers.

Both the Messrs. Banks were large landowners, and Mr. Henry Banks owned thirty or more plantations, with a cotton acreage on all of them ranging from two hundred acres down. Mr. Rodgers was thoroughly familiar with the landed interests of the Messrs. Banks.

The contract was operated under during 1903 and 1904 without any friction. In 1903 delivery was made from the places, but not enough to satisfy the contract, and settlement was made as to the residue on a basis of cash for middling cotton, and in 1904 the cotton was delivered from the said places. Before the time of the performance of the contract in 1905, both Mr. Rodgers and Mr. Henry Banks had died. In fulfillment of the contract in 1905, tender was made to the executors of Mr. Rodgers's estate of cotton of the average grade and quality on the Marianna market at the time such deliveries were due. This was refused, and this action was brought to enforce a specific performance of the contract to the effect that cotton taken from the Soudan and Westwood places only should be delivered in payment of the contract, and to enjoin it from being diverted into the market until the payments under the contract were satisfied. In the trial parol testimony was introduced to show the intention of the parties to the contract, and correspondence between the parties was also introduced, the most important being the letter just quoted. It was established that, owing to the grade and staple of the cotton grown on the Soudan and Westwood places, said cotton was worth on an average one cent more on the market in Marianna than the average cotton sold on that market at the same time. The superior grade and quality of the Soudan and Westwood cotton was due to several facts, one of which was the strength of the land in the St. Francis bottoms, where said plantations were situated, and the superior quality of the seed used thereon and the excellent manner of planting, ginning and handling the crop. During the ownership of Mr. Rodgers the plantations had been largely planted with what is known as "Black Rattler" seed,

which produced a fine quality of staple cotton. But under the management of the Soudan Planting Company it was found that the tenants were dissatisfied with the "Black Rattler" seed, owing to the difficulty in picking same, and change was made to seed for another long staple cotton, which continued to make Soudan cotton average better than cotton generally on the Marianna market.

Under the ownership of the Soudan Planting Company, a new and expensive gin was installed, and this improved the grade of the cotton ginned by it. The grade of the cotton was determined largely, if not entirely, by the method of planting, cultivating, ginning and handling, while the staple was principally determined by the seed and the soil.

The Soudan and Westwood plantations had evidently been well managed under Mr. Rodgers's management, and continued to be well managed under the Banks management, and, owing to the improved gin placed there, the grade of the cotton was improved. This management, coupled with the fertility and strength of the soil and the quality of cotton raised thereupon, had given and continues to give the Soudan and Westwood cotton the grade and staple referred to, producing on an average one cent per pound more on the Marianna market than the average cotton marketed there.

No question was raised in the chancery court as to the jurisdiction of chancery to enforce specific performance of the contract in question, and none is raised here. The chancery court held that it was the intention of the contract that delivery should be made from cotton grown on the Soudan and Westwood places, and decreed accordingly, giving judgment in favor of the estate of Rodgers for one cent per pound more than the value of the cotton which was tendered, and the planting company has appealed.

*N. W. Norton,* for appellant.

1. The prior negotiations were merged into the executory contract, the executory contract was merged into the deed, and the latter alone can be looked to. 30 Ark. 153; 80 Ark. 505. From the deed itself, therefore, must the question be determined whether or not the cotton to be delivered should be raised on these plantations. The mere intention, or even expressed

intention, of the grantee to raise the cotton on the plantations would not create an obligation to do so, nor be any part of the consideration, unless it appears by the deed itself that both parties so regarded it at the time. 12 Sup. Ct. Rep. 84; 16 Pa. St. 117; 1 Add. Cont. 15; 110 Mass. 389; 95 S. W. 994; *Id.* 806.

2. Expectations of parties to a contract are no part of the obligation. 12 Wall. 548; 99 Fed. 109. What one party believes is no criterion in the construction of a contract, unless the belief was induced by the other party, and it must have been also a material part of the agreement, and for a consideration. 17 Wall. 19; 117 Fed. 477; 162 U. S. .303; 2 N. E. 915; 33 N. E. 745; 60 N. Y. 487; 95 Fed. 741. See also, 32 S. E. 485; 89 N. W. 957; 25 Ind. 44; 1 Ct. App. Ky. 267; 84 Ind. 576; 49 Ind. 588; 32 Ark. 59; 91 Law T. 319; 22 Wall. 105.

3. Equity will not enforce specific performance of a contract when to do so would work a hardship. Pomeroy, Spec. Perf. 47 and note; 34 N. E. 288; 8 Wall. 557. Nor will it specifically enforce a contract that is indefinite, uncertain and incomplete. Pomeroy, Spec. Perf., § § 145, 159. It will not enforce a contract imposing continuous duties extending over a long period of time and involving details too intricate for the court to superintend. 10 Wall. 399.

*H. F. Roleson* and *Moore, Smith & Moore,* for appellees.

1. The parties intended that the cotton should be grown on the Soudan place. No other construction can be placed on that part of the deed providing that "in case delivery is hindered by bad weather, scarcity of pickers, or other circumstances beyond the control of the Soudan Planting Company, then delivery of cotton shall be made as soon after the dates mentioned as possible."

What is implied in a contract is as much a part of it as what is expressed. 8 Wall. 288; 18 Ark. 77. If the intent of the parties is not sufficiently established by the deed itself, the letter of Lem Banks, dated November 10, 1902, does manifest it beyond question, and resort may be had to that letter in order to show the intent and meaning of the contract. 55 Ark. 20; 28 Ark. 282; 46 Ark. 127; 15 Ark. 549; 35 Ark. 164.

This letter should be treated as a part of the contract; it is not extrinsic evidence, but a paper which is itself one of the writings going to elucidate the entire terms of the contract. 45 Ark. 25. But, if not treated as a part of the contract, then it is still competent as extrinsic evidence for the purpose of interpreting the contract and making it more certain. 28 Ark. 146; 40 Ark. 23; 84 Fed. 895; 148 U. S. 587; 82 Am. Dec. 659; 75 Ark. 94; 54 Ark. 195; 55 Ark. 114.

2. The interpretation adopted by the immediate parties to the contract forms a correct basis for its interpretation by the court. 46 Ark. 131. For further authorities supporting appellee's contentions, see 15 Wall. 100; 168 U. S. 277; 91 U. S. 269; 143 U. S. 609.

3. Appellant planting company is bound by the negotiations in regard to the purchase. 37 Ark. 187; 101 U. S. 392.

4. Where a contract has been entered into by competent parties and for an adequate consideration, the subject-matter thereof being lawful and not contrary to public policy, it may be specifically enforced, and especially so where one party has performed his part of the contract. In this case the contract was entirely performed by Rodgers in his lifetime by the conveyance and surrender of possession of the property to appellants. 30 Ark. 553; 5 Paige, Ch. (N. Y.), 234; 6 Gray (Mass.), 30; 91 N. W. 183; 2 Story's Eq. (7th Ed.), § § 723-4; Pomeroy, Spec. Perf., § 165 *et seq.;* 26 Am. & Eng. Enc. of L. 29, 30, and notes.

*N. W. Norton,* for appellant in reply.

1. There is a distinction between what is implied and what is *necessarily* implied. 42 N. E. 356; 8 Wall. 288, illustrating appellant's contention. As a rule, there can be no implied contract, where there is a written contract. 22 Ark. 158.

2. The intention of parties cannot be imported into a contract where its terms are plain and unambiguous, and they do not express it. 114 Fed. 77; 57 L. R. A. 696.

3. There is no such uncertainty or ambiguity in the contract as to call for an interpretation of it based on the conduct of the parties. 64 Pac. 659; 36 So. 1005; 17 Atl. 1004. The contract is silent as to the grade of the cotton, but appellees raise no issue as to that, their contention being that they must have cotton grown on the place. Conduct relied on to remove

an ambiguity must itself be free from ambiguity.  62 N. E. 609.

HILL, C. J., (after stating the facts).  Counsel for the respective sides have cited the court to a wealth of authorities sustaining their positions.  But, when the cases are examined and the positions analyzed, there is found to be no great difference between counsel as to the principles of law controlling the case, the difficulty being in their application to the facts in hand. For instance, counsel for appellees contend that what is necessarily implied from a contract is as much a part of the contract as that which is written therein.  Counsel for appellant admits this, but differs as to what is necessarily implied in this contract.

That it was the expectation of both parties to this contract that the payments should be made from the cotton raised upon the Soudan and Westwood places is apparent, and that is conceded by appellant.  But whether it was the intention of the parties to the contract that the payments should be made from this cotton alone is quite a different question.  Taking the contract as originally drafted, there is nothing which shows any intention to contract for delivery from the plantations alone. Appellees principally base their claim to the insertion in the contract of such intention from the letter of Mr. Banks requesting that, in case delivery is hindered by bad weather, scarcity of pickers and other circumstances, time be extended, and point out that the letter shows on its face that it was the intention of the parties that the cotton on the place should be the cotton delivered; that the letter, reasonably construed, would mean that Mr. Banks had in mind that the cotton on this place should be delivered in payment of the contract is evident.  And it is further evident that Mr. Henry Banks and Mr. Rodgers had talked over the subject of delivery from the places in payment of the contract.  But Mr. Banks does not request in this letter that such an important matter be inserted in the contract; nor does Mr. Rodgers request it.  The purpose of the letter was to secure indulgence in time of payment under certain contingencies.  This indulgence Mr. Rodgers consented to.  This was the point and extent of the negotiation.  The negotiation ended in the insertion of the clause in question.  This negotiation brought that clause into the contract and nothing more.  There is an implication in the letter that the cotton was to be delivered

from the Soudan and Westwood places. But that implication is not carried into the contract at the instance of either party, and it is not a necessary implication to be drawn from the contract itself.

It is said that the motive and inducement to Mr. Rodgers to enter into this contract was the certainty of getting the grade and quality of cotton from Soudan which would bring better prices than the ordinary cotton on the Marianna market. And parol testimony tending to show that such was the inducing clause to him entering into this agreement was introduced. The Supreme Court of the United States has said: "It is, however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration of the contract. Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is 'the cause or meritorious occasion requiring a mutual recompense in fact or in law'." *Philpot v. Gruninger,* 14 Wall. 570.

It is not made a part of the consideration of this contract that the cotton delivered under it should be raised on the Soudan and Westwood places. A mere motive or inducing cause to the contract, not having been placed in the contract by the parties, became no part of it, and the court should not insert for them something which they did not insert for themselves. That it was the intention of both parties that cotton from these plantations should be delivered in fulfillment of the contract is strongly urged, and it is insisted that such intention, shown by the parol testimony and the correspondence, should be written into the contract itself. This contention cannot be better answered than by Judge Sanborn, in speaking for the Federal Court of Appeals for the Eight Circuit, where he said:

"It is said that the intention of the parties was to make an agreement that the plaintiff should sell and deliver, and the defendant should buy, all the articles of the character specified in the offer which should be needed or required by its business between October 27, 1898, and June 1, 1899; that the purpose of the construction and interpretation of contracts is to

ascertain the intention of the parties; and that this contract should be interpreted to effect this intent. The answer is that, while ambiguous terms and doubtful stipulations may be interpreted to carry out the intention of the parties when they fairly evidence it, their secret intention cannot be imported into contracts whose terms and meaning are plain and unambiguous, and do not express it. It is only the intention of the parties which the contract itself expresses that the courts may enforce. To give effect to the intention of the parties which the defendant now alleges would be to ascribe to them a purpose, and to make and enforce for them a contract, which their writings neither express nor suggest; and this is beyond the province of the courts." Citing many authorities. *Cold Blast Transp. Co.* v. *Kansas City B. & N. Co.*, 114 Fed. 77, 57 L. R. A. 696.

It is urged that there is ambiguity in this contract in the use of the term "cotton," and that, owing to this ambiguity, patrol evidence should be let in to ascertain what cotton was intended. It is plain, under the evidence in this case, that the term "cotton" is susceptible to many meanings. Cotton ranges in grade and quality from long staple, which brings a premium frequently many cents above the average, to "dog-tail," which is a poor grade and of little value. But the question in this case is not as to the meaning of the term "cotton" generally, but is whether the parties contracted that the payments should be made with the identical cotton raised upon these two plantations. If the parties contracted that the payments should be made from cotton raised upon these plantations, then the grade and quality of the cotton is immaterial. If they did not contract for the cotton to be delivered from these plantations, then the grade and quality of the cotton contemplated by the contract does become material, and, that being unexpressed, the parties are left to a judicial determination of what the term "cotton" would mean under the contract. Without anything to indicate some particular grade or quality of the cotton, necessarily it would mean cotton of the average grade and quality at the time and place of delivery.

It is insisted that the letter of Lem Banks should be construed as a part of the contract itself. But that argument is not sound, for all antecedent negotiations, whether oral or writ-

ten, are deemed to be merged into the written contract which covers the subject-matter of the antecedent negotiation, when such contract is free of ambiguity itself. *Lower* v. *Hickman,* 80 Ark. 505, and cases therein cited. The essential part of that letter has been merged into the contract in express terms, and the other part of it—that is, the implication that the cotton was to come from the Soudan and Westwood places— being left out, the inference to be drawn is that it was intentionally left out. There is no attempt made in this case to reform the contract on ground of fraud, accident or mistake, so as to insert therein a clause to the effect that the cotton was to be grown upon these plantations, and, even if it was attempted, the effort would fail because the evidence lacks that clear, unequivocal and decisive quality which is necessary to prove the omitted matter before a written instrument will be reformed. *McGuigan* v. *Gaines,* 71 Ark. 614; *Goerke* v. *Rodgers,* 75 Ark. 72.

Both parties quote approvingly from *Forsyth Mfg. Co.* v. *Castlen,* 37 S. E. 485. The case is much in point. It grew out of a contract between a manufacturing company and a planter. The manufacturing company agreed to pay the planter six cents per pound for one hundred and fifty bales of lint cotton, to be delivered at its warehouse in good merchantable condition at certain times therein designated. The planter agreed to deliver the cotton at the times and places designated. The planter tendered to the manufacturing company sufficient cotton to fulfill his contract, but all the cotton was not raised upon his place, and six bales raised upon his place were sold elsewhere. The company refused to receive the bales raised upon land not belonging to the planter. The court said:

"It is clear from the evidence in this case that it was the intention of the parties that there should be an actual delivery of cotton, and it is to be inferred from the testimony that at the time the contract was entered into both parties to the contract expected that Castlen (the planter) would comply with his contract by the delivery of cotton raised on his lands. This was not, however, made a stipulation in the contract, and the fact that for some reason Castlen was unable to comply with his contract with cotton procured from this source would not pre-

vent him from purchasing in the market cotton sufficient to comply with his contract."

It was contended there, as it is here, that parol testimony was admissible for the purpose of removing ambiguity from the contract, and the court said:

"It appears from the authorities above cited, in order to render parol evidence admissible for the purpose of making complete an incomplete contract, the fact that the contract is incomplete must appear upon the face of the contract by reason of a patent ambiguity, or, although apparently complete on its face, in the light of evidence showing the circumstances surrounding the parties at the time the contract was executed a latent ambiguity is made to appear."

Again the court said:

"The contract between the parties evidenced by the writing calls for a certain number of bales of cotton of a certain description, and for no particular cotton. It is clear that, so far as the terms of the contract are concerned, the parties did not intend that the plaintiff should be limited to cotton raised by him. It was a plain and unambiguous contract for the delivery of any cotton answering to the description specified in the contract which the plaintiff might see fit to offer to the defendant at the times specified in the contract. Such being the legal effect of the paper, parol evidence tending to show that the real contract was that the cotton was raised on the land of the plaintiff contradicted and varied and altered the very terms of the written instrument. There being no patent ambiguity in the contract, of course parol evidence was not admissible on the ground that such an ambiguity might be explained. Evidence showing that it was the intention of the parties to make a contract whereby plaintiff should be confined to cotton raised on his own lands did not raise a latent ambiguity, but directly impeached an unambiguous instrument. If such evidence could be held to raise a latent ambiguity, then the rule prohibiting the introduction of parol evidence would be, in effect, abrogated. If such was the intention of the parties, and this was omitted from the contract by fraud, accident or mistake, of course the defendant would have a right in a court of equity to reform the contract, but he cannot in a court be allowed in this manner to contradict

the terms of a plain, unambiguous paper by parol evidence."

The reasoning in this case is peculiarly applicable here, and is considered sound. The result of these views is that the judgment must be reversed, and the cause dismissed.